IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Terrell J. Woodley,                           )
                                              )
                    Plaintiff,                )    Civil Action No. 6:09-3364-RMG-KFM
                                              )
                                              )    **REPORT OF MAGISTRATE JUDGE**
        vs.                                   )
                                              )
Michael J. Astrue,                            )
Commissioner of Social Security,              )
                                              )
                    Defendant.                )
_____)

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security finding him ineligible for supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff, as a minor child, was initially found to be eligible for supplemental security income (SSI) benefits commencing January 1, 1993, due to attention deficit hyperactivity disorder, based on an application filed on January 14, 1993.  The plaintiff attained the age of 18 on June 19, 1997, and his claim was reevaluated as a childhood age 18 redetermination pursuant to sections 211 and 212 of Public Law 104-193.  On the redetermination, it was determined that the plaintiff's condition had improved and he no longer had marked and/or severe functional limitations.  Therefore, disability was

_____

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

found to have ceased on August 1, 1997, and eligibility for benefits was terminated at the close of the last day of October 1997.

The plaintiff's mother requested reconsideration of the decision, which was denied by a disability hearing officer on June 14, 1999. She then filed a timely request for hearing. After a hearing on February 10, 2000, the Administrative Law Judge (ALJ) issued a denial decision, finding that the plaintiff could perform medium work that did not involve continuous use of the left hand. The plaintiff requested review of the decision, and on December 6, 2001, the Appeals Council vacated the hearing decision and remanded the case for further evaluation of the plaintiff's physical and mental limitations and for evidence from a vocational expert.

The plaintiff and his mother appeared and testified at a supplemental hearing held on March 13, 2002, in Charleston, South Carolina. The plaintiff was represented by attorney Mark Archer, and vocational expert Mark Meadows, Ed.D., also testified at the hearing. On January 13, 2003, the ALJ found that the plaintiff could perform a range of medium work and was not disabled. On July 10, 2004, the Appeals Council denied the further request for review, finding no reason under the rules to review the decision.

Subsequently, on September 15, 2004, the plaintiff filed an action in this court for judicial review (C.A. 6:04-22228-SB-WMC). On February 2, 2006, the Honorable Sol Blatt, Jr., Senior United States District Judge, issued an order adopting the recommendation of the Honorable William M. Catoe, then United States Magistrate Judge, that the decision be reversed and the case be remanded for further proceedings. In his recommendation, Judge Catoe stated that the plaintiff's antisocial personality traits and his moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining concentration and attention for extended periods should have been included in the hypothetical. In addition, the ALJ was instructed to obtain testimony from the vocational expert to explain why the plaintiff would be able to perform the jobs named

2

in the previous hearing and to consider and evaluate the testimony of the plaintiff's witness, his mother, and set forth his reasons for not crediting her testimony.

A third hearing was held on January 24, 2007. The plaintiff was not present but was represented by attorney Beatrice Whitten. The plaintiff's mother, Ms. Hermina Woodley, appeared and testified before the ALJ. Arthur F. Schmitt, Ph.D., a vocational expert, also testified at the hearing. Following the hearing, the ALJ found on February 16, 2007, that the plaintiff could perform a range of medium work and was not disabled.

The plaintiff again sought judicial review in this court in an action filed April 11, 2007 (C.A. 6:07-985-SB-WMC). On April 2, 2008, Judge Catoe recommended that the Commissioner's decision be affirmed. By order filed July 25, 2008, Judge Blatt reversed the denial of benefits and remanded the matter to the Commissioner with instructions to obtain vocational expert testimony to explain the apparent conflict in the vocational expert's testimony regarding the plaintiff's ability to perform work.

The fourth hearing was held on August 7, 2009, at which the plaintiff, again represented by Beatrice Whitten, appeared and testified. Also appearing at the hearing were the plaintiff's caregiver, Travis Harrison, and vocational expert Mr. Schmitt. On December 4, 2009, the ALJ found that the plaintiff's disability had ceased on August 1, 1997. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council declined to review the ALJ's decision. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant attained age 18 on June 18, 1997, and was eligible for supplemental security income benefits as a child for the month preceding the month in which he attained age 18. The claimant was notified that he was found no longer disabled as of August 1, 1997, based on a redetermination of disability under the rules for adults who file new applications.

3

(2)    Since August 1, 1997, the claimant has had the following severe impairments: borderline intellectual functioning and depression (20 CFR 416.920(c)).

(3)    Since August 1, 1997, the claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

(4)    The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 416.971 *et seq*.).

(5)    Since the alleged onset date of disability, January 1, 1993, the claimant has had the following severe impairment: borderline intellectual functioning, antisocial traits, loss of grip strength in the left hand due to flexion contracture, and chronic back pain (20 CFR 416.920(c)).

(6)    Since the alleged onset date of disability, January 1, 1993, the claimant has not had an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

(7)    After careful consideration of the entire record, the undersigned finds that since August 1, 1997, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: Claimant is limited to simple, routine, repetitive tasks involving low stress and no exposure to the public and only occasional contact with co-workers and supervisors.

(8)    The claimant has no past relevant work (20 CFR 416.965).

(9)    The claimant was born on June 19, 1979, and is a younger individual age 18-44 (20 CFR 416.963).

(10)    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

(11)    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

(12)    Since August 1, 1997, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

(13)   The claimant's disability ended on August 1, 1997 (20 CFR 416.987(e) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

Individuals who are eligible for SSI benefits as children must have their eligibility for SSI redetermined under the rules for disability used for adults.  20 C.F.R. § 416.987(b).  The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled

5

at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct

6

a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The record reveals that the plaintiff was 30 years old on the date of the Commissioner's final decision (*see* Tr. 4L). He completed the ninth grade in special education classes and has no past relevant work experience (Tr. 41-42).

On August 12, 1997, Cashton B. Spivey, Ph.D., evaluated the plaintiff at the request of the Commissioner (Tr. 232–34). Dr. Spivey noted that the plaintiff had never been hospitalized for any physical or mental problem and had been taking Ritalin for ADHD, but that he had not taken Ritalin on the day of the evaluation. The plaintiff denied symptoms of depression or psychosis, reported normal sleep and energy level, and complained of problems with attention/concentration. He indicated he could read a newspaper and perform simple arithmetic calculations. Dr. Spivey found the plaintiff had Borderline Intellectual Functioning with a Verbal IQ of 73, a Performance IQ of 73, and a Full Scale IQ of 72. He noted that the plaintiff displayed no weakness in immediate visual memory, which he found to be inconsistent with ADHD. He found that the plaintiff read and performed arithmetic at a fifth-grade level. Dr. Spivey concluded that the plaintiff was developing antisocial personality traits, would continue to benefit from special education classes, and would hopefully be able to be a successful member of the work force in the

7

future.  Dr. Spivey also concluded that the plaintiff was better suited for manual labor than verbal or arithmetic tasks.

On August 18, 1997, Dr. John Aycock examined the plaintiff at the request of the Commissioner.  Dr. Aycock found the plaintiff had a flexion-tendon injury of the ring finger of the left hand, which could be surgically corrected, and no other physical abnormalities.

On August 21, 1997, Dr. Herbert Gorod completed a Psychiatric Review Technique Form regarding the plaintiff at the request of the Commissioner, based on a review of the plaintiff's records (Tr. 219-27).  Dr. Gorod reported that the plaintiff's Borderline Intellectual Functioning and antisocial personality disorder caused "moderate" limitations in activities of daily living, social functioning, and concentration, and had "once or twice" resulted in episodes of decompensation in work-like settings.  In an accompanying Mental Residual Functional Capacity Assessment, Dr. Gorod reported that the plaintiff had no significant limitations in most areas of work-related mental functioning, and "moderate" limitations in understanding, remembering, and carrying out detailed instructions, and accepting instructions and responding appropriately to criticism from supervisors.

On February 25, 1999, Dr. James W. Folk, Jr., examined the plaintiff at the request of the Commissioner (Tr. 261-64).  The plaintiff complained of back pain resulting from an injury sustained in September 1998, when he was struck by a truck, and an inability to extend his left ring finger.  He denied a history of psychiatric treatment, and except for Motrin and occasional doses of Ritalin to help him calm down, he denied taking medication. He stated that he spent his time exercising, walking around, and playing basketball, and that he did some household chores and yard work.  He reported that he had recently completed a GED program but had not yet taken the test due to lack of funds.  Ms. Woodley, the plaintiff's mother, indicated that the plaintiff "[ran] with a bad crowd," engaged in various antisocial behaviors, and had difficulty with various tasks due to a failure to pay

8

attention.  Dr. Folk found that the plaintiff had fair memory and limited general information; below-average counting, calculating, and digit-recall abilities; absent insight; moderately-impaired judgment; and low-average intellectual functioning. He found the plaintiff capable of interacting socially, concentrating, and understanding and responding appropriately, and noted that the plaintiff denied many of the behaviors described by Ms. Woodley.  Dr. Folk reported diagnoses of ADHD (by history) and antisocial personality traits.  He stated that although the plaintiff had a history of ADHD, "presently the concern would be more his personality deficits and the need for some structure in his life" (Tr. 263).  Dr. Folk concluded that the plaintiff was "quite capable of doing some type of manual labor" and recommended referral to the Department of Vocational Rehabilitation.

On March 16, 1999, Lisa Smith-Klohn, Ph.D. completed a Psychiatric Review Technique Form regarding the plaintiff at the request of the Commissioner based on a review of the plaintiff's records (Tr. 269-77).  Dr. Smith-Klohn reported that the plaintiff's ADHD, Borderline Intellectual Functioning, and Antisocial Personality Disorder caused "moderate" limitations in activities of daily living and social functioning, "often" caused deficiencies of concentration, and "never" resulted in episodes of deterioration or decompensation in work-like settings.  In an accompanying Mental Residual Functional Capacity Assessment, Dr. Smith-Klohn reported that the plaintiff had no significant limitations in most areas of work-related mental functioning and moderate limitations in understanding, remembering, and carrying out detailed instructions, and in maintaining concentration and attention for extended periods.

On April 29, 1999, Dr. Richard Weymuth assessed the plaintiff's Physical Residual Functional Capacity at the request of the Commissioner based on a review of the plaintiff's records (Tr. 280-87).  Dr. Weymuth concluded that the plaintiff did not have a "severe" physical impairment.

On December 20, 1999, an orthopedist at the Medical University of South Carolina found that the plaintiff had decreased grip strength in the left hand and problems with flexion and contraction in the fingers of the left hand, particularly the ring finger, due to a previous injury (Tr. 254).

On March 14, 2000, Dr. Craig Harris examined the plaintiff in relation to complaints of injuries sustained in a motor vehicle accident one week earlier (Tr. 342-44). The plaintiff complained of headaches, dizziness, insomnia, neck pain, upper back pain, mid-back pain, low-back pain, and left hand and wrist pain. Dr. Harris found the plaintiff had normal strength in the upper and lower extremities, decreased range of motion of the lumbar spine, muscle spasms in the cervical region, and decreased grip strength in the left hand. He noted an assessment of cervicogenic cephalgia, cervical strain/sprain, thoracic strain/sprain, lumbar strain/sprain, and exacerbation of pre-existing hand injury. Dr. Harris recommended medication for inflammation and pain. The plaintiff returned to Dr. Harris on an unspecified date, complaining of severe low back and left hand pain. His neurological examination was unremarkable. Dr. Harris recommended continued conservative treatment and an MRI scan.

On October 14, 2001, the plaintiff presented at Care Alliance Health Services with complaints of headaches and of pain in the right knee and mid-back following a motor vehicle accident (Tr. 348-54). An impression of contusion of the right knee and back strain was rendered.

On January 10, 2002, the plaintiff returned to Care Alliance Health Services complaining of back pain since October 2001 (Tr. 357-63). The plaintiff related that he had taken no medication to attempt to relieve his pain, and his examination was unremarkable. He was diagnosed with chronic low-back pain.

In June 2002, the plaintiff sought emergency room treatment for complaints of low back pain (Tr. 497-502). Examination revealed decreased range of motion and

muscle spasms in the lower back.  Anaprox and Norflex were prescribed for chronic low-back pain.

In October 2004, the plaintiff sought emergency room treatment for complaints of dizziness, headache, and nausea (Tr. 468-75).  A CT scan of his head was normal.  Compazine was administered, and a diagnosis of acute cephalgia was noted.

In November 2005, the plaintiff sought emergency room treatment for complaints of head and back pain after a fall (Tr. 454-66).  On admission, "Jim Grant Carpeting" was identified as his employer.  A CT scan of the plaintiff's head was normal, and x-rays of his back showed a mild compression deformity at T7-8.  Percocet was prescribed.

In March 2006, the plaintiff received emergency room treatment for complaints of intermittent headaches after he fell and hit his head several months before (Tr. 445-53).  "Jim Grant Carpeting" was identified as the plaintiff's employer.  Examination was unremarkable except for elevated blood pressure.  A CT scan of his brain was normal.  He was diagnosed with chronic headache and hypertension.  Lortab and antihypertensive medication were prescribed.

On March 2, 2009, the plaintiff was involuntarily admitted to a psychiatric facility (Tr. 532-33).  The plaintiff ruminated over his mother's recent passing (in May 2008) and described hearing her voice.  He was delusional and experiencing auditory hallucinations.  Dr. Benjamin Weinstein reported that the plaintiff was unkempt in appearance and exhibited slow speech and disorganized thought process with paucity of content.  On the day of his admission, the plaintiff's GAF was 30[2] (Tr. 549-50).  This

---

[2]"GAF" or "Global Assessment of Functioning" ranks psychological, social and occupational functioning on a hypothetical continuum of mental illness ranging from zero to 100.  A GAF of 21 to 30 indicates behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends).  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

admission lasted seven days.  Dr. Weinstein diagnosed the plaintiff with major depressive disorder with psychotic features and recommended ruling out dependent personality disorder and mental retardation.  On discharge, the plaintiff's GAF was 40.[3]  The plaintiff was discharged on the following medications: Celexa, Seroquel, Norvasc, Lisinopril, and Klonopin.  Although his condition was improved upon being discharged from the facility, he showed poor insight and displayed dependent behavior (Tr. 532-33).

Upon the plaintiff's discharge from the psychiatric facility, involuntary outpatient treatment was recommended.  The examiner noted that the plaintiff's mood was "better" and his speech was clear.  The plaintiff denied visual and auditory hallucinations and stated that medication was helping (Tr. 629).  On March 10, 2009, a probate judge ruled that the plaintiff was mentally ill and in need of treatment because his "medical condition lacks sufficient insight or capacity to make responsible decisions with respect to his treatment; or because of the condition, there is a likelihood of serious harm to himself or others."  The plaintiff was ordered to undergo outpatient treatment at the Charleston/Dorchester Community Mental Health Center (Tr. 628).

On March 13, 2009, the plaintiff was again admitted to the Institute of Psychiatry at the Medical University of South Carolina (MUSC) (Tr. 534-35).  The plaintiff continued to ruminate about his mother's death.  At the time of admission, his blood pressure was extremely high because he had not been taking his medications.  The plaintiff exhibited some paranoid behavior, believing that MUSC killed his mother and might kill him. The plaintiff was discharged on March 16, 2009, with diagnoses of schizoaffective disorder, bipolar type (in place of major depressive disorder with psychotic features); probable mental

---

[3]A GAF of 31 to 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.*

retardation or borderline IQ; hypertension; and mild, chronic mental illness.  Upon discharge, he had a GAF of 45.[4]  His discharge medications were Hydrochlorothiazide, Lisinopril, Norvasc, Celexa, and Seroquel.  Dr. Ray Worthen reported that the plaintiff "suffers from intrinsic psychotic process that is likely chronic and exacerbated by recent events of the last several months, including but not limited to patient's mother dying."  The doctor further noted that the plaintiff's "baseline functioning [was] lower than first believed."

At a followup appointment on April 30, 2009, the plaintiff appeared "quiet, suspicious, with bizarre comments at times."  The plaintiff appeared overly sedated, and his blood pressure was still poorly controlled (Tr. 558-59).  At a followup appointment on May 21, 2009, the plaintiff and his cousin reported the plaintiff had "modest" improvements in mood and thoughts.  He still occasionally heard voices, and the counselor felt the plaintiff would likely benefit from an increased dose of antipsychotic medication (Tr. 556-57).

At the hearing on February 10, 2000, the plaintiff testified that he left school in the tenth grade (Tr. 27).  He testified that he attempted to work as a dishwasher in a pizza shop and that the job ended after one day because his hand hurt (Tr. 28).  He testified that his left hand was weak and that it sometimes started "jumping" for no apparent reason (Tr. 30).  He testified that he experienced pain in his right leg when walking (Tr. 31).  He testified that he could read "a little bit" and could write (Tr. 29).

At the hearing on March 13, 2002, the plaintiff testified that he had enrolled in a GED class but never completed it (Tr. 42-43).  He testified that he was unable to grip anything with his left hand, and that he experienced intermittent back pain, mostly at night (Tr. 43).  He testified that he did "not really" know how to read (Tr. 44-45).  The plaintiff's mother, Hermina Woodley, testified that the plaintiff did not complete household chores he

---

[4]A GAF of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*

started, could not understand instructions, and could not successfully buy items on a shopping list (Tr. 47-49). She testified that his only activities were watching television and listening to the radio (Tr. 47-48). She testified that he was impatient and quick to become angry (Tr. 50-52). She testified that he no longer took Ritalin and that aspirin was his only medication (Tr. 52).

At the hearing on January 24, 2007, the plaintiff did not testify (Tr. 503-22). Ms. Woodley testified that the plaintiff's back bothered him all the time since he was hit by a truck in 2002 and that he had headaches associated with high blood pressure for which he took medication (Tr. 507). She testified that, although improved, he continued to have problems controlling his anger and was forgetful (Tr. 508-09). She testified that he could not finish tasks without being reminded (Tr. 509-10). She testified that the plaintiff pushed her around in her wheelchair, gave her medications, watched television, spent time with her granddaughter, and did housework if constantly told what to do (Tr. 510-12). She testified that the plaintiff's main problem was back pain (Tr. 513).

At the August 7, 2009, hearing, the ALJ heard testimony from the plaintiff's cousin, Travis Harrison (Tr. 641-48), who testified that he helped to care for the plaintiff after the passing of the plaintiff's mother in May 2008 (Tr. 641, 647). He described ensuring that the plaintiff ate, took his medication, and paid his bills (Tr. 642). The plaintiff was unable to keep his job at a car wash (Tr. 644-45). Mr. Harrison stated that the plaintiff was able to clean and prepare simple meals (Tr. 642-43). Mr. Harrison testified that prior to the plaintiff's hospitalizations in March 2009 he was experiencing mood swings (Tr. 643). He further testified that he checks on the plaintiff every morning and every evening when he returns home from work (Tr. 646).

The ALJ then heard testimony from the impartial vocational expert (Tr. 649-650). He posited the following hypothetical question:

14

> Doctor, please assume a hypothetical worker the same age as the claimant with the same education and lack of work history, who has no exertional limitations, and can work at any exertional level. However, he has the following non-exertional limitations that apply at any level. Simple repetitive one and two step tasks. A low stress setting where there is no more than occasional decisionmaking, or changes in the work setting. No exposure to the general public, and no more than occasional interaction with co-workers and supervisors. Interaction being defined not just [as] physical proximity but as working in conjunction or cooperation with others. Can you identify unskilled work consistent with that, Dr. Schmitt?

(Tr. 649-50). In response, the vocational expert identified the occupations of janitor, laundry operator, and hand packaging.  He described the incidence of each occupation in the regional and national economies.


## ANALYSIS

The plaintiff was 30 years old on the date of the Commissioner's final decision. He has a ninth-grade education in special education classes and no past relevant work experience.  The ALJ found that the plaintiff's disability ended on August 1, 1997.  The ALJ further found that the plaintiff has the RFC to perform a full range of work at all exertional levels but limited to simple, routine, repetitive tasks involving low stress and no exposure to the public and only occasional contact with co-workers and supervisors.  The ALJ found that the plaintiff could perform the occupations of janitor, laundry operator, and hand packaging. The plaintiff argues that the ALJ's decision is not supported by substantial evidence and the ALJ erred by:  (1) disregarding evidence; (2) failing to properly consider his credibility; and (3) failing to properly consider the combined effect of his impairments.


### *Psychiatric Hospitalizations*

By letters dated March 27, April 9, and June 18, 2009, prior to the most recent hearing, the plaintiff's lawyer sent the ALJ the medical records regarding the plaintiff's

15

hospitalizations in a psychiatric facility in March 2009 and his followup appointments at the mental health center (Tr. 531, 543, 555). Those records are part of the official transcript in this case (Tr. 531-66, 628-32). However, the ALJ did not mention these records in his decision, and the plaintiff argues that the decision is therefore not based upon substantial evidence. The Commissioner argues that the "psychiatric hospitalization[5] in March 2009 reflected a period of acute illness, and it was not evidence of the plaintiff's level of functioning over 12 months or more" (def. brief 13). Accordingly, the Commissioner argues that the ALJ "reasonably omitted" any discussion of the plaintiff's hospitalization.

First, as argued by the plaintiff, the Commissioner's argument is a *post-hoc* rationalization not offered by the ALJ. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). As the records were not mentioned in the ALJ's decision, it is impossible to determine whether the ALJ considered the evidence and rejected it because it because it was not probative of the plaintiff's level of functioning over a period of 12 months or more. Second, this court agrees with the plaintiff that his hospitalizations may show a deteriorating level of functioning, which is highly relevant to his claim for benefits. As the plaintiff's mental state is directly at issue in this case, evidence that the plaintiff was paranoid, delusional, and experiencing auditory-hallucinations, which required that he be involuntarily hospitalized, is certainly relevant to whether the plaintiff is now disabled.

Based upon the foregoing, upon remand, the ALJ should be directed to consider the records of the plaintiff's psychiatric treatment and hospitalizations in the sequential evaluation process. Furthermore, this court recommends that a consultative psychiatric examination of the plaintiff be required upon remand to aid in the decisional

---

[5]The evidence shows that the plaintiff was actually hospitalized *twice* in March 2009, as discussed above (*see* Tr. 532-35).

process as "[t]here is an indication of a change in the [plaintiff's] condition that is likely to affect [his] ability to work . . . but the current severity of [his] impairment is not established." 20 C.F.R. § 416.919a(b).

### *Credibility*

The plaintiff next argues that the Commissioner failed to sufficiently explain the finding that his testimony lacked credibility.  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility."  *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *4.

17

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)   the individual's daily activities;

(2)   the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)   factors that precipitate and aggravate the symptoms;

(4)   the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)   treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)   any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)   any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, the plaintiff's testimony as to the intensity, persistence and limiting effects of the symptoms was not credible to the extent it was inconsistent with the RFC assessment (Tr. 4R).  The plaintiff argues that "the ALJ cherry picked a few medical records and a few snippets of hearing testimony, summarized them, and then determined without adhering to the previously recited method by which to analyze credibility that [his] testimony was lacking" (pl. brief 17).

The Commissioner argues that the ALJ properly articulated his reasoning in support of the credibility finding.  This court agrees with the Commissioner's position.  The ALJ found the plaintiff's claims of significant back pain were not "fully credible," noting that

18

recent examinations of his back showed no significant abnormalities, he was not taking any strong pain relief medication, he was not seeing a physician for treatment on a regular basis, and Drs. Spivey and Folk opined that the plaintiff could perform "manual labor" (Tr. 4S). *See* SSR 96-7p, 1996 WL 374186, at **4-8. Based upon the foregoing, this allegation of error is without merit.

### Combined Effect of Impairments

Lastly, the plaintiff argues that the ALJ erred by failing to consider the combined effect of his impairments at step three of the sequential evaluation. In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

At step three of the sequential evaluation, the ALJ discussed Listing 12.05C (Mental Retardation) and Listing 12.04 (Affective Disorders). However, he did not discuss or apparently consider whether the combined effect of the plaintiff's impairments met or equaled a listed impairment. Furthermore, as discussed above, the ALJ failed to consider pertinent evidence regarding the plaintiff's mental impairments at all stages of the evaluation. Accordingly, upon remand, the ALJ should be directed to consider all of the plaintiff's impairments in combination in accordance with the above-cited law.

19

***July 2008 Order***

The Commissioner also discusses in his brief the ALJ's compliance with Judge Blatt's order in the plaintiff's previous federal case.  *See Woodley v. Astrue*, 572 F.Supp.2d 638, 650-51 (D.S.C. 2008).  This issue was not raised by the plaintiff but will be addressed here out of an abundance of caution.

In the July 2008 remand order, Judge Blatt directed the ALJ to obtain testimony to explain the apparent conflict in the vocational expert's testimony in the 2007 administrative hearing.  The conflict centered around the effect of the plaintiff's "moderate mental limitations" on his ability to perform work.  *Id.*  In the 2007 hearing, "[t]he VE testified, on the one hand, that a claimant with the limitations set forth by the ALJ, including a moderate limitation in concentration, could perform the jobs of carton worker and laundry worker, and then on the other hand, the VE testified that he would eliminate all jobs for a claimant with a moderate limitation in concentration (defined as unable to concentrate more than 50 percent of the time)."  *Id.* at 651.

On remand, in the 2009 hearing, the ALJ did not obtain vocational expert testimony concerning "moderate" mental limitations.  However, as argued by the Commissioner, the ALJ "accounted for these same mental limitations in the residual functional capacity finding" (def. brief 15).  The ALJ limited the plaintiff to "simple, routine, repetitive tasks involving low stress and no exposure to the public and only occasional contact with co-workers and supervisors," and the vocational expert testified that the plaintiff could perform the occupations of janitor, laundry operator, and hand packaging (Tr. 4Q; 649-50).  This court agrees that this finding articulated the antisocial personality traits and moderate mental limitations discussed in the preceding ALJ hearing.  However, as discussed above, the ALJ failed to consider important evidence regarding the plaintiff's mental limitations, including two admissions to a mental facility in March 2009, and, upon

remand, the ALJ should be directed to consider that evidence at all steps of the sequential evaluation.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.[6]

s/Kevin F. McDonald
United States Magistrate Judge

January 3, 2011

Greenville, South Carolina

---

[6]The plaintiff asks that the court reverse the Commissioner's decision without remand and that he be awarded benefits.  Title 42, United States Code, Section 405(g) provides: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  The Fourth Circuit Court of Appeals has stated, "Under this statute [42 U.S.C. § 405(g)], we think it appropriate to reverse without remanding where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974). The plaintiff's cases have been remanded on two previous occasions by the district court, and he has had four hearings at the administrative level.  While the plaintiff may be understandably frustrated at the process, this court cannot say that reopening the record for more evidence would serve no purpose.